**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**GLOBAL MARKETING GROUP,**
**INC., et al., Defendants.**

**Case No. 8:06–cv–2272–T–33TGW.**

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 24, 2008.

David A. O'Toole, James H. Davis, Federal Trade Commission, Chicago, IL, for Plaintiff.

Ira N. Rubin, Indian Rocks Beach, FL, pro se.

Carl Francis Schoeppl, Schoeppl & Burke, PA, Boca Raton, FL, Johanne Valois–Shoffstall, Law Offices of Johanne Valois, PA, Cheryl Ann Thompson, Grayrobinson, PA, Tampa, FL, for Defendants.

## ORDER

VIRGINIA M. HERNANDEZ COVINGTON, District Judge.

This cause comes before the Court on plaintiff Federal Trade Commission's motion for summary judgment against defendant Ira Rubin (Doc. # 181), filed on August 25, 2008. Rubin has not filed a response in opposition to the motion, and the time for Rubin to do so has elapsed. For the reasons that follow, the Court grants the FTC's motion for summary judgment.

## I. Background

From January 2003 until December 2006, Rubin used some 24 corporations to provide substantial assistance to at least eight Canadian advance-fee telemarketers by processing payments made to them by consumers. (Doc. # 38 at ¶ 35; Doc. # 183–3 at ¶¶ 164–368.) The eight advance-fee telemarketers included, Centurion Financial Benefits, First Approval Benefits, United Cards Services, Dapco Card Services, Credit Helper, Trek Benefits, Brentwood Capital, and Benefits Plus.[1] During this period of time, Rubin helped the telemarketers ultimately net at least $8,615,185 from consumers.[2] In this motion, the FTC seeks summary judgment

---

1. In its complaint, the FTC alleged that Rubin was involved with at least nine telemarketers. However, in this motion for summary judgment, the FTC only seeks damages for Rubin's involvement with eight of the telemarketers.

2. Decl. Douglas McKinney ¶ 9, Attach. L at 64; Doc. 183–3 at ¶¶ 163, 234, 249, 269, 289, 314, 328.

as well as injunctive, monetary, and ancillary relief against Rubin for his participation in the alleged unlawful conduct. (Doc. # 182 at 15.)

## A. The Telemarketing Operation

The scheme at issue involved telephone calls to consumers made by the telemarketers. The telemarketers would induce consumers to purchase unsecured credit cards and credit card loss protection services for advance fees as high as $249. (Doc. # 183–3 at ¶¶ 166, 168, 171.) However, after paying for these services, consumers received neither the credit card nor the loss protection services and arrangements were never made for the consumers to receive what they purchased. (*Id.* at ¶¶ 171, 207, 222, 242.) These telemarketing operations generated extraordinarily high returns. (Doc. # 183 at ¶ 35.) For example, the return rate for Centurion Financial Benefits, one of the eight telemarketers, was 71.5%. (Doc. # 183–3 at ¶ 174.)

The telemarketers received assistance through some 24 corporations that Rubin either owned or for which he served as a corporate officer. These 24 corporations shared officers, employees, and office space. (Doc. # 183–3 at ¶¶ 150–52.) In addition, the corporations commingled funds, were commonly controlled, and all participated in the alleged unlawful conduct. (*Id.* at ¶¶ 153–155.) Specifically, these corporations 1) processed the consumers' payments to the telemarketers by withdrawing the funds from their bank accounts; 2) fulfilled the consumers' or-

ders by sending worthless benefits packages; and 3) provided customer service and complaint handling. (Doc. # 183–3 at ¶¶ 201, 216, 255, 274, 293, 317, 339, 340. *Cf.* Doc. # 83 at ¶ 36.)

Rubin was intimately involved in the day-to-day operations of these 24 corporations. (Doc. # 183–3 at ¶¶ 127–147.) According to the FTC's statement of undisputed material facts,

> [Rubin] traveled regularly to Canada to both recruit new clients and manage existing clients; he negotiated processing agreements with merchants and also handled modification and termination of such agreements; he served as [the corporations'] primary contact with the bank that provide[d] [the corporations] with access to the ACH Network [3]; he reviewed, edited, and approved sales scripts used by [the telemarketers]; he received and reviewed daily reports detailing returns generated by [the telemarketers]; and he handled law enforcement inquiries regarding [the telemarketers].

(Doc. # 183 at ¶ 125.)

In the four year period of Rubin's involvement with these eight telemarketers, Rubin and his corporations withdrew more than $26 million dollars from unsuspecting consumers' bank accounts and ultimately succeeded in netting at least $8,615,185.[4] (Doc. 183–3 at ¶¶ 163, 177, 209, 224, 234, 244, 249, 263, 269, 282, 289, 304, 314, 325, 328.)

**3.** The Automated Clearing House Network, ACH Network, is a nationwide electronic funds transfer system that provides for the interbank clearing of electronic payments. (Doc. # 1 at ¶ 18.)

**4.** As the FTC explains, "the total amount that [Rubin's] clients succeeded in stealing from consumers ($8,615,185, the clearance or settlement rate) was generally much lower than the gross amount originated by Defendants on behalf of the clients ($26,282,886)" because "Rubin's clients generated extraordinarily high returns." (Doc. # 183 at 10 n. 2.)

## B. Procedural History

On December 11, 2006, the FTC filed its complaint (Doc. # 1) against Rubin, the corporations he owned and controlled, as well as several other individual defendants for injunctive and other equitable relief.[5] In count I, the FTC alleges that Rubin violated the assisting and facilitating provision of the Telemarketing Sales Rule by providing assistance to telemarketers that Rubin knew or consciously avoided knowing induced consumers to pay for goods and services through false or misleading statements, 16 C.F.R. § 310.3(a)(4). (Doc. # 60 at ¶¶ 53–54.) In count II, the FTC alleges that Rubin violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) by engaging in deceptive or unfair acts and practices. (*Id.* at ¶ 57.)

On December 12, 2006, the Court entered an *ex parte* temporary restraining order that froze all of Rubin's assets and imposed various conduct restrictions and reporting requirements. (Doc. ## 13, 15.) On January 11, 2007, the Court entered a stipulated preliminary injunction order that essentially made the TRO permanent. (Doc. # 36.)

After Rubin violated both the TRO and the injunction by withdrawing more than a half a million dollars from frozen accounts, the Court granted, on January 15, 2008, the FTC's motion for order to show cause why Rubin should not be held in contempt. (Doc. ## 126, 135.) Pursuant to the order, Rubin was required to appear before the Court on January 28, 2008, to show cause why he should not be held in contempt. (Doc. # 135.) Rubin failed to appear before the Court, and the Court held Rubin in contempt of court and issued an arrest warrant. (Doc. # 138.) Since then,

according to the FTC, Rubin remains at large in Costa Rica. (Doc. # 182 at 4.)

The FTC now seeks final judgment against Rubin pursuant to Fed.R.Civ.P. 56 as to all counts of its complaint. In addition, the FTC seeks a permanent injunction and a monetary judgment of $8,615,185 against Rubin.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) (citing *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d

**5.** The FTC filed its first amended complaint on March 19, 2007, and added 18 more defendants. (Doc. # 60.)

265 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir.2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988) (citing *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir.1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir.1981).

## III.  Analysis

The FTC raises a claim for violation of the assisting and facilitating provision of the TSR, 16 C.F.R. 310.3(b), as well as a claim for violation of the unfair acts and practices provision of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. # 60.) In support of its motion for summary judgment, the FTC has submitted Rubin's responses to the FTC's first request for admissions, several hundred pages of internal documents and communications re-

garding Rubin's conduct, as well as numerous sworn affidavits. (Doc. # 182 at 2–3.)

Rubin has conducted no independent discovery in this case and has not otherwise challenged the accuracy or authenticity of the FTC's evidence. Of particular importance is Rubin's responses to the FTC's request for admissions and answer to the FTC's complaint wherein he invokes his Fifth Amendment rights. (Doc. ## 38; 183–4.) It is well-settled that a court, in the context of a civil case, may draw adverse inferences from a party's refusal to testify. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Arango v. United States Dept. of the Treasury*, 115 F.3d 922, 926 (11th Cir.1997). "Courts may not draw adverse inferences, however, if it is the sole basis for [p]laintiff's prima facie case, or will cause the 'automatic entry of summary judgment.'" *F.T.C. v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247, 1252 (S.D.Fla.2007) (citing *United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir.1991)).

The FTC has compiled all of its evidence into a single statement of undisputed facts. (Doc. # 183.) Upon review of the FTC's statement of undisputed facts, and evidence cited in support thereof, as well as the governing law in this case, the Court finds there are no genuine issues of material fact as to Rubin's violations of the Telemarketing Sales Rule and the FTC Act. Therefore, the Court grants summary judgment in favor of the FTC on both counts of its complaint. Furthermore, the Court finds that a permanent injunction and a monetary judgment of $8,615,185 against Rubin are appropriate in this case.

### A.  The Telemarketing Sales Rule

In count I, the FTC alleges that Rubin violated the assisting and facilitating provision of the TSR. (Doc. # 60 at

¶¶ 53–55.) Under the TSR's assisting and facilitating provision,

> It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R. § 310.3(b). In support of this claim, the FTC relies on adverse inferences from Rubin's answers to its request for admissions wherein Rubin invokes his Fifth Amendment rights. (Doc. # 182 at 9–11.) These adverse inferences, independently supported by other record evidence (Decl. Douglas McKinney, Attach. CC), support this Court's conclusion that the FTC is entitled to summary judgment as to count I of its complaint.

First, the telemarketers engaged in deceptive telemarketing acts and practices in violation of Section 310.3(a) of the TSR by making misleading statements to induce consumers to purchase goods or services. The telemarketers promised unsecured credit cards and credit card loss protection services in exchange for advance fees. (*See* Doc. # 183–3 at ¶¶ 166, 168.) However, they never intended to follow though and never made arrangements to follow through with the promised services. (*See id.* at ¶ 171.)

Second, Rubin substantially assisted the telemarketers by playing a key role in the scheme at issue before this Court. He processed the more than $26 million dollars in payments made by consumers to the telemarketers. (*Id.* at ¶¶ 177, 209, 224, 244, 263, 282, 304.) He reviewed, edited, and approved the telemarketers' sales scripts (Decl. Douglas McKinney, Attach. CC at 6, 64) and even handled customer complaints and law enforcement inquiries.

(Doc. # 183 at ¶ 36; Decl. Barbara A. Blake.) He also received periodic reports detailing the telemarketers' returns (Doc. # 183 at ¶ 125), which were as high as 71.5%. (Doc. # 183–3 at ¶ 173.)

Finally, at a minimum, Rubin consciously avoided knowing the telemarketers were engaged in deceptive acts and practices given the extraordinary high return rate and Rubin's substantial involvement in the telemarketing scheme. Thus, there are no genuine issues of material fact as to whether Rubin violated the assisting and facilitating provision of the TSR and summary judgment as to count I is appropriate.

**B. Section 5(a) of the FTC Act**

In count II, the FTC alleges that Rubin engaged in unfair acts and practices by withdrawing funds from consumers' bank accounts in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. # 60 at ¶¶ 56–65.) To establish that Rubin engaged in unfair practices, the FTC must show 1) a substantial injury; 2) that the substantial injury is not outweighed by countervailing benefits to consumers or competition; and 3) that consumers themselves reasonably could not have avoided the injury. *Orkin Exterminating Co. v. F.T.C.*, 849 F.2d 1354, 1364 (11th Cir.1988).

In support of summary judgment, the FTC relies on adverse inferences from Rubin's assertion of his Fifth Amendment rights in his response to the FTC's first request for admissions. (Doc. # 182 at 12–13.) In light of these inferences and the independent record evidence supporting these inferences (*See* Decl. Douglas McKinney, Attach. CC), which Rubin has not disputed, summary judgment as to count II is appropriate.

First, Rubin's conduct resulted in a substantial injury. During the four year peri-

od Rubin was involved with the telemarketers, he processed more than $26 million dollars in payments made by consumers to the telemarketers. (Doc. 183–3 at ¶¶ 177, 209, 224, 244, 263, 282, 304, 325.) In the end, he succeeded in netting at least $8,615,185 to the telemarketers. (Decl. Douglas McKinney ¶ 9, Attach. L at 64; Doc. 183–3 at ¶¶ 163, 234, 249, 269, 289, 314, 328.) Second, the substantial injury is not outweighed by countervailing benefits to consumers or competition because consumers never received the credit card or credit card loss protection they purchased. (Doc. # 183–3 at ¶¶ 171, 207, 222, 242.)

Finally, the Court finds the FTC has met the final prong of the unfairness standard—whether consumers reasonably could have avoided their injuries. "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it." *Orkin Exterminating Co.*, 849 F.2d at 1365. Under the facts presented here, consumers could not have reasonably avoided their injuries. The Court therefore finds it appropriate to enter summary judgment in favor of the FTC as to count II of its complaint.

## C. Damages

The FTC seeks injunctive, monetary, and ancillary relief against Rubin for his violations of the TSR and the FTC Act as well as to hold Rubin personally liable for the practices of his 24 corporations. (Doc. # 182 at 13–15.)

### 1. Rubin's Individual Liability

The FTC argues that Rubin is individually liable for the deceptive practices of his 24 corporations through which he operated his illegal payment processing business. (*Id.* at 13.) An individual may be held liable for corporate violations if the FTC can show "that the individual defendants participated directly in the practices

or acts or had authority to control them [and] that the individual had some knowledge of the practices." *F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). Authority is established by proof that the individual participated in corporate activities by performing the duties of a corporate officer. *F.T.C. v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005). Knowledge may be proven by "evidence that the individual[ ] had ... an awareness of a high probability of fraud along with an intentional avoidance of the truth." *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir.2005).

Adverse inferences taken from Rubin's answers to the FTC's discovery requests, which are supported by independent record evidence, demonstrate Rubin had authority over and knowledge of the conduct of the 24 corporations. (*See* Decl. Douglas McKinney, Attach. CC; Doc. # 183–3.) Rubin was a corporate officer. (Doc. # 183 at ¶ 123.) He actively participated in and exercised a great deal of control over the corporations' day-to-day activities. (*Id.* at ¶¶ 123–27.) As the FTC explains in its statement of undisputed material facts, Rubin "formulated, directed, controlled, or participated in the acts and practices of the [corporations]." (*Id.* at 124.)

The Court finds that Rubin either had actual knowledge of the illegal activity or that he was aware of a high probability of fraud and chose to avoid the truth. Rubin reviewed the telemarketers' sales scripts, which plainly indicated their intent to engage in illegal conduct. (Decl. Douglas McKinney Attach. CC; Doc. # 183 at ¶ 34.) Rubin also received periodic reports detailing the telemarketers' high return rates and handled law enforcement inquiries into the telemarketers' illegal conduct. (Decl. Barbara A. Blake; Doc. # 183 at ¶ 125.) Because Rubin's control over and knowledge of the corporations'

involvement with the telemarketers is undisputed, summary judgment in favor of the FTC regarding Rubin's individual liability is appropriate.

### 2. Injunctive Relief

The FTC seeks a permanent injunction enjoining Rubin from engaging in the practices that violated the TSR and Section 5 of the FTC Act as well as from engaging in any and all future involvement with telemarketing operations. (Doc. # 182 at 15–17.) Under Section 13(b) of the FTC Act, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). A permanent injunction restraining a defendant "from engaging, directly or indirectly, in any and all future involvement with telemarketing operations" is an appropriate remedy if it would protect the public from potential future violations by the defendant. *F.T.C. v. Wetherill*, No. CV 92–2295(DT)(EEX), 1993 WL 264557, *6 (C.D.Cal. June 10, 1993).

Here, Rubin was involved with the telemarketers in nearly every aspect of their operations. He reviewed the telemarketers' scripts, processed the more than $26 millions dollars paid to them by withdrawing funds from consumer bank accounts, and even handled consumer complaints and law enforcement inquiries. (Doc. # 183 at ¶ 125.) Accordingly, a permanent injunction restraining Rubin from engaging, directly or indirectly, in any and all future involvement with telemarketing operations is necessary to prevent future violations of the FTC Act and TSR.

### 3. Monetary Judgment Against Rubin

In addition to injunctive relief, the FTC seeks a monetary judgment of $8,615,185 against Rubin, the full amount of consumer injury caused by the telemarketing scheme. (Doc. # 182 at 17.) The Eleventh Circuit has held that the full amount lost by consumers is an appropri-

ate award of damages. *Gem Merch. Corp.*, 87 F.3d at 470. "The Commission must show that its calculations reasonably approximate[ ] the amount of customers' net losses, and then the burden shifts to the defendant[ ] to show that those figures were inaccurate." *F.T.C. v. Febre*, 128 F.3d 530, 535 (7th Cir.1997).

In this case, the FTC has presented sufficient proof of damages and is therefore entitled to a judgment against Rubin for $8,615,185. The FTC has submitted records obtained from Rubin and the 24 corporations indicating that the net sales of the eight telemarketers with which Rubin was involved were $8,615,185. (Decl. Douglas McKinney ¶ 9, Attach. L at 64; Doc. 183–3 at ¶¶ 163, 234, 249, 269, 289, 314, 328.) The Court has reviewed the affidavits submitted in support of this damage award and concludes the FTC has submitted sufficient proof of consumer injury caused by Rubin's conduct. Rubin, however, has failed to respond to the FTC's motion and has otherwise failed to meet his burden by proffering evidence tending to show the FTC's calculations were inaccurate. Accordingly, based on the undisputed evidence submitted by the FTC, the Court finds it appropriate to enter a monetary judgment against Rubin in the amount of $8,615,185. appropriate.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The FTC's motion for summary judgment against defendant Ira Rubin (Doc. # 181) is hereby **GRANTED.**

(2) Judgment shall therefore be **ENTERED** against Ira Rubin, in the amount of $8, 615, 185 and a permanent injunction shall be **ISSUED.**