**FEDERAL TRADE COMMISSION,**
Plaintiff

v.

**PARTNERS IN HEALTH CARE
ASSOCIATION, INC., et al.,**
Defendants

Civil Action No. 14-23109-Civ-Scola

United States District Court,
S.D. Florida.

Signed May 31, 2016

Gary L. Ivens, Federal Trade Commission, Washington, DC, for Plaintiff.

Christopher E. Brown, U.S. Federal Trade Commission, Washington, DC,

Bruce S. Rogow, Tara A. Campion, Bruce S. Rogow PA, Maidenly Macaluso, Grumer & Macaluso, P.A., Fort Lauderdale, FL, for Defendants.

Partners in Health Care Association, Inc., Oshkosh, WI, pro se.

Gary L. Kieper, Menasha, WI, pro se.

### Order on the FTC's Motion for Summary Judgment

Robert N. Scola, Jr., United States District Judge

The Federal Trade Commission ("FTC") sued Partners In Health Care Association, Inc. ("PIHC"), Gary L. Kieper, and others (collectively, "the Defendants") for deceptive trade practices in violation of Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "TSR"), 15 U.S.C. § 6101 *et seq*. The FTC has moved for summary judgment against Kieper, who is *pro se*. (ECF No. 163.) For the following reasons, the Court **grants** the FTC's motion.

### 1. Background

This case involves the telemarketing and sale of medical discount plans by the Defendants and others from early 2010 until this Court entered a temporary restraining order in August 2014.

### A. The Defendants' Business Practices

PIHC is a for-profit Wisconsin corporation which was founded in 2005. (PIHC Articles of Incorporation, PX 41 at 18.)[1]

---

1. In support of its motion, the FTC relies on evidence submitted in support of its motion

for a temporary restraining order, as well as additional evidence attached to its motion for

Kieper is PIHC's president and sole officer and controls the company's day-to-day activities. PIHC has no employees; instead, Kieper's other company, Tri Resource Group Ltd. ("TRG"), provides PIHC's man-power and support. (*See* Kieper Dep., PX 25 at 4; Request for Admissions, PX 25 at 32–33.) As with PIHC, Kieper is TRD's president and sole officer and controls the company's day-to-day activities. (PX 25 at 32–33.) PIHC and TRD share an office and principal place of business in Wisconsin. (*See id*; Aiken Dec., PX 48 at 2 n.2.).

In early 2010, PIHC began selling medical discount cards ("Discount Card"). (FTC's Statement of Undisputed Facts, ECF No. 163–1 at 2.) This program was not health insurance; rather, members would receive discounts from physicians and pharmacies who accepted the card.

In order to reach consumers, PIHC entered into agreements with several third-party marketers, including Defendant United Solutions Group Inc. d/b/a Debt Relief Experts, Inc. (*Id.*) Another of the marketers was GMV Marketing, LLC ("GMC"), of which Kieper was part owner. (*See id.* at 8.) The marketing agreements stated that "no sales, marketing, or other promotional materials as they directly relate to the Program may be distributed without PIHC's approval ...." (*See, e.g.,* United Solutions Agreement, PX 47 at 1.) Therefore, the marketers had to go to PIHC to receive approval for marketing scripts. (*See* Answer, ECF No. 43 at ¶ 18; *see also* New Script Email, PX 25 at 53–58; Regennitter Dep., PX 26 at 14.) In

exchange, PIHC handled "all billing, credit card processing, and other payment matters," as well as providing consumers with customer support and all materials related to the Discount Card. (*See* PX 47 at 2–3.) PIHC also opened merchant accounts for marketers. (Husk Dep., PX 28 at 5.)

The marketers advertised the Discount Card through telemarketing, Spanish-language radio ads, and television ads. (*See* Avelar Dec., PX 1 at 1 (found product through a radio ad); Boertman Dec., PX 2 at 1 (automated telemarketing call); Catania Dec., PX 3 at 1 (television ad).) Some consumers, after entering their information into websites that offered health insurance quotes, were called directly by a PIHC marketer "in response to [their] inquiry for health insurance." (Keel Dec., PX 7 at 1; *see also* Krahan Dec., PX 8 at 1.)

Many of the ads used by the marketers referenced health insurance or "health plans." For example, one of the robocalls that was created to advertise the Discount Card stated,

> Wait. Do not hang up on this message. This may be the most important call of your life. Our records indicate that you either have no health insurance or due to the new regulation changes you may not qualify. Do not fall victim to this country's faulty health care system. You may qualify for health insurance even with pre–existing conditions during this open–access period. Press 1 now to speak to a live representative, or Press 9 to be removed from the list.

(Romero Dep., PX at 24 80.)[2]

summary judgment. The FTC has created an identification system for the evidence using the reference "PX." The FTC has consistently used this system throughout its motions and submitted a CD to the Court containing all of the referenced documents with their PX number. Accordingly, in order to avoid confusion, the Court will continue to use the PX reference numbers when citing the FTC's exhibits.

Furthermore, many marketers told consumers that the Discount Card was a "health insurance policy" or satisfied the insurance requirements of the Affordable Care Act. (*See, e.g.*, Colon Dec., PX 4 at 1 (informing consumer that the company sold "affordable health insurance," including "coverage for 70% or 80% of services from physicians inside PIHC's network")). For example, when one consumer was concerned about the low price of the Discount Card and asked the marketer to confirm that it was insurance, the marketer replied that "the PIHC plan could not be called insurance right then, but that after Obamacare became effective, the PIHC plan could actually be called 'insurance.'" (PX 1 at 1–2; *see also* Perez Dec. PX 15 at 10 (describing how marketer explained that the "plan" would satisfy "Obamacare.")). Other marketers described the Discount Card to consumers using terms like "premiums," "co–pay," "deductible," "coverage," and "pre–existing condition." (*See, e.g.*, PX 3 at 1; PX 4 at 2; PX 6 at 1; PX 7 at 1; PX 9 at 1–2; PX 10 at 1; PX 11 at 1; PX 12 at 1.)

One consumer declaration supplied by the FTC provides a good illustration of an average consumer interaction with PIHC and its marketers. In March 2014, Regina Keel was looking for affordable health insurance and entered information into websites that offered health insurance information. (Keel Dec., PX 7 at 1.) A few days later, Keel received a call from "Charles," who received Keel's information from her online search. (*Id.*) Charles told Keel that he "could offer [her] health care coverage

and a benefit care package at a reasonable rate." (*Id.*) To verify, Keel had Charles confirm that he was offering health insurance. (*Id.*) Keel and Charles discussed her health and she informed him that she "had a lot of medical bills accumulating." (*Id.*) Charles told Keel that the plan would cost $129 per month, plus a one–time enrollment fee of $99. (*Id.* at 2.) Keel again had Charles confirm that the plan was "real health insurance." (*Id.*) Keel agreed to purchase the plan and was transferred to a different representative to verify her personal and payment information. (*Id.*)

A few weeks later, Keel received a package from PIHC in the mail, containing a booklet and two cards. (*Id.*) The cards said "Not Insurance" on the front and the booklet revealed that Keel had purchased a medical discount plan. (*Id.* at 2–3.) Keel called PIHC and spoke to customer service. Keel was informed that she was not eligible for a refund because she had not returned her materials within ten days of her purchase. (*Id.* at 3.) Keel explained that she received her materials after the ten–day cancellation window, but she was still refused a refund. (*Id.*) Because of her experience, Keel filed a complaint with the Better Business Bureau. (*Id.*)

Keel's experience was nearly identical to two undercover calls placed by FTC investigators. United Solutions Group assured a Spanish-speaking FTC investigator that she was purchasing insurance and that the insurance included free dental, vision, and hearing coverage in addition to the "basic care" coverage. (Transcript, PX 38 at 6, 8.) "Basic care" included "emergency health care, planned health care, access to hospi-

---

**2.** In his opposition, Kieper asserts that the Court should not consider this recording because it has not been used "in over a year." (ECF No. 179 at 28.) In making this argu-

ment, however, Kieper admits that this call was in–fact used to sell the Discount Card and, therefore, there is no dispute of material fact.

talization and surgery ... [and] all types of lab tests: Pap–test, x–rays, tomography, for all of this, you will have coverage." (*Id.* at 6.) When the investigator tried to cancel her membership after receiving the Discount Card, a PIHC representative told her that the plan was "the same as Obamacare" and that it "works like insurance, but we can't, we can't call it insurance, okay?" (Transcript, PX 9 at 36, 53). PIHC gave the investigator a list of clinics which allegedly accepted the plan; when contacted, however, none of the clinics had ever heard of PIHC. (PX 31 at 4). In the other undercover call, the English-speaking FTC investigator was told that the "health plan" would have co–pays ranging from $10 to $30 and that the plan would cover "everything," including x–rays, emergencies, and lab tests. (Transcript, PX 33 at 6, 16–17, 26.)

Many of PIHC's customers filed Better Business Bureau complaints stating that they were told by marketers that they were buying health insurance. (*See* Kraemer Dec., PX 32 at 1; Better Business Bureau Report, PX 43 at 2.) Kieper personally responded to many of these complaints. (*See* PX 25 at 44; PX 48 at 3.) In addition to the Better Business Bureau complaints, customers complained to PIHC directly and canceled their memberships. In as early as 2010, PIHC received a couple of customer complaints *per day* claiming that marketers told them that they were buying insurance. (PX 26 at 4–5.) One of TRD's employees, Kassina L. Regennitter, talked with Kieper about the problem. (*Id.*). Kieper also received emails from other individuals bringing his attention to the numerous complaints. (*See* January 2, 2013 Email, PX 25 at 59–60; August 4, 2011 Email Chain, PX 27 at 32–33; July 11, 2014 Staff Complaints Email, PX 29 at 22–24.) Kieper continually denied that the market-

ers were selling the Discount Card as insurance. (*See*, e.g., Lewis Dec., PX 11 at 5–6.) Instead, he asserted that buyers "hear what they want to hear" and that any actual deceptive practices were anomalies which were the fault of the individual telemarketers. (*See* PX 25 at 11–12, 59–60.) Because of the complaints, PIHC was investigated by the Wisconsin Better Business Bureau and Wisconsin Department of Agriculture, Trade and Consumer Protection. (PX 26 at 57–58.) Kieper was aware of the investigation. (*See id.*)

Additionally, PIHC tracked their membership numbers in a program called Enrollment123. (PX 26 at 11.) Kieper and Regennitter received emails with the Enrollment123 statistics. (*Id.*) In November 2011, the Enrollment123 email showed that 5,550 memberships had been purchased, 1,409 remained active and 2,798 had been canceled. (*Id.*) In August 2014, only 1,773 members out of 24,740 purchased memberships remained active. (*Id.*)

### B. Procedural History

On August 25, 2014, the FTC filed a three-count complaint against PIHC, Kieper, United Solutions Group Inc., and the individuals in charge of United Solutions. (Complaint, ECF No. 1.) In Count 1, the FTC alleges that the Defendants violated Section 5 of the FTC Act by "represent[ing], directly or indirectly, expressly or by implication, that the Discount Card is health insurance, or the equivalent of such insurance." (*Id.* at 12.) In Count 2, against PIHC and Kieper, the FTC alleges that the same representations violated the TSR. (*Id.* at 13.) In Count 3, the FTC alleges that PIHC and Kieper violated the TSR by "provid[ing] substantial assistance or support" to telemarketers engaged in TSR violations. (*Id.* at 14.)

In addition to filing its complaint, the FTC moved for a temporary restraining order. (Ex Parte Motion for Temporary Restraining Order, ECF No. 4.) The Court granted the motion. (Temporary Restraining Order, ECF No. 9.) On September 4, 2014, the Court held a preliminary injunction hearing, (ECF No. 23), and, on September 8, 2014, entered a preliminary injunction (ECF No. 32).

On November 25, 2014, PIHC and Kieper's attorney moved to withdraw as counsel. (Amended Motion to Withdraw, ECF No. 82.) On December 2, 2014, the Court granted the motion and gave Kieper and PIHC until December 29, 2014 to obtain new counsel. (Order, ECF No. 88.) Kieper elected to proceed *pro se.* (Answer, ECF No. 128.) To date, PIHC has not retained new counsel and a company may not proceed *pro se.* On November 9, 2015, the United Solutions Defendants stipulated to an order for permanent injunction and monetary judgment. (Stipulated Order, ECF No. 167.) On October 30, 2015, the FTC moved for summary judgment against Kieper. After Kieper filed a response and the FTC filed its reply, Kieper filed a Motion for Denial of the Plaintiff's Reply. (ECF No. 186.) After reading the motion, the Court construes it as a surreply. Although Kieper did not move for leave to file a surreply, the Court will consider his arguments in ruling on the motion for summary judgment.

## 2. Legal Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina,* 560 U.S. 330, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1140 (11th Cir.2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00,* 391 Fed.Appx. 791, 794 (11th Cir.2010) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.,* 448 Fed.Appx. 17, 19 (11th Cir.2011). Mere "metaphysical doubt as to the material facts" will not

suffice. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

### 3. Analysis

#### A. Count 1: Violations of the FTC Act

█ Section 5 of the FTC Act prohibits the use of "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The FTC asserts that Kieper is liable under this statute because marketers and PIHC employees represented to consumers that the Discount Card was insurance. "Individuals can be held liable for corporate practices that violate the FTCA ..., but only if the FTC has first established the corporation's liability." *FTC v. Vacation Prop. Servs.*, No. 8:11–cv–00595, 2012 WL 1854251, at *2 (M.D.Fla. May 21, 2012). Therefore, the Court must first analyze whether PIHC committed violations of the FTC Act.

#### i. PIHC's Violations

█ "To establish liability under [S]ection 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003). "In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created." *FTC v. RCA Credit Servs., LLC*, 727 F.Supp.2d 1320, 1329 (M.D.Fla.2010). "In making such a determination at the summary judgment stage, the Court may consider affidavits or other documentary evidence submitted by the parties." *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02–21050, 2003 WL 25429612, at *4 (S.D.Fla. June 2, 2003) (Ungaro, J.), *aff'd*,

157 Fed.Appx. 248 (11th Cir.2005) (per curiam) (finding Judge Ungaro's summary judgment opinion "detailed" and "thoroughly explained"). "Additionally, the Court may examine the representation itself to determine whether the net impression is such that the representation would be likely to mislead reasonable consumers." *Id; see also FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 396–97, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) ("[T]he words 'deceptive practices' set forth a legal standard and they must get their final meaning from judicial construction."); *FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 745 (N.D.Ill. 1992) (granting summary judgment after conducting an "independent assessment of the 'net impression'" of defendants' representation). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *F.T.C. v. RCA Credit Servs., LLC*, 727 F.Supp.2d 1320, 1329 (M.D.Fla.2010) (quotation omitted).

█ Proof of intent to deceive is not required to establish liability. *FTC v. Windward Mktg., Inc.*, No. 1:96–cv–615F, 1997 WL 33642380, at *9 (N.D.Ga. Sept. 30, 1997). "A company that deceives consumers through reckless or even simply negligent disregard of the truth may do just as much harm as one that deceives consumers knowingly." *In re Sears Roebuck & Co.*, 95 F.T.C. 406, 517 n. 9 (1980). Moreover, an explicit lie is not required— "[d]eception may be accomplished by innuendo rather than by outright false statements." *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3rd Cir.1963). "A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers

purchased the defendant's product." *FTC v. Figgie Int'l., Inc.*, 994 F.2d 595, 605 (9th Cir.1993).

█ After careful consideration of the consumer declarations, the FTC investigators' phone transcripts, the record as a whole, and the relevant case law, it is clear that the net impression created by PIHC and its marketers was that the Discount Card was insurance. Not only did many marketers explicitly state that the Discount Card was insurance, but others used terms like "copay," "premium," and "deductible" which are commonly associated with insurance. *See Capital Choice Consumer Credit*, 2003 WL 25429612, at *5 (finding marketing deceptive when the defendants "use[d] terms and promises rewards that are commonly associated with the offering of general purpose credit cards," which the defendants' product was not). Some marketers told consumers that they could "keep their doctor," that the Discount Card satisfied the Affordable Care Act, or the card would cover emergency procedures and laboratory testing. *See In re Raymond Lee Organization*, 92 F.T.C. 489, 631–32 (1978) ("[T]he sale of services that have no reasonable prospect of achieving the results claimed [is deceptive]."). In not one call before the Court did a marketer accurately explain how the Discount Card worked. Moreover, these statements were material because they were made in order to induce consumers to purchase the Discount Card. *See RCA Credit Servs.*, 727 F.Supp.2d at 1329.

Importantly, Kieper does not dispute that misrepresentations were made or that they misled consumers.[3] (*See* ECF No. 179

at 1–4, 12–13.) Instead, Kieper appears to argue that PIHC cannot be held responsible because United Solutions is solely responsible for any misrepresentations made in television or radio advertisements, Kieper and PIHC took remedial measures to ensure that consumers knew that they were not purchasing insurance, and PIHC had satisfied customers. (*See Id.* at 2, 8, 12–13, 29–31).

First, Kieper's assertion that United Solutions is solely at fault for any misrepresentations ignores much of the evidence before the Court. PIHC received complaints involving *all* of its marketers, not just United Solutions. (*See* PX 26 at 18–19.) Kieper is even a part-owner of one of the other marketing companies. (*See* PX 29 at 22–24 (detailing staff complaints at GMV Marketing regarding customer cancelations and staff concerns about whether the product was legitimate.)) The one thing that these marketing companies have in common is PIHC. Moreover, some PIHC representatives, presumably employees of TRG, also represented that the Discount Card was like insurance. (PX 9 at 36, 53.)

█ Additionally, "[t]he law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations." *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 527 (S.D.N.Y.2000); *see also FTC v. Med. Billers Network, Inc.*, 543 F.Supp.2d 283, 329–30 (S.D.N.Y.2008) (finding company liable for the misrepresentations of its third-party telemarketer);

---

**3.** At one point in his opposition, Kieper does make conclusory allegations that parts of some of the consumer declarations are false (*see* ECF No. 179 at 29–32); these allegations, however, are immaterial in light of Kieper's many concessions regarding whether misrepresentations occurred.

*FTC v. Stefanchik*, No. C04–1852, 2007 WL 1058579, at \*6–7 (W.D.Wash. Apr. 3, 2007); *Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir.1957) ("[T]he courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."). The marketers had the authority to advertise the Discount Card on behalf of PIHC through the marketing agreements. Therefore, PIHC may be held liable for the acts of its agents.

Next, Kieper argues that PIHC took remedial measures to counteract any misrepresentations; specifically, Kieper asserts that every Discount Card purchaser went through a "Welcome Call" to verify that the consumer knew what she was purchasing. (*See* ECF No. 179 at 6.) Kieper also argues that he re–trained sales representatives, verbally reprimanded representatives, and terminated individuals. (*See id.* at 3–6, 22.) As an initial matter, Kieper cites to no evidence supporting his conclusory assertions about remedial measures. Even if the Court were to credit Kieper's statement that a Welcome Call was *supposed* to occur, he has offered no evidence that the Welcome Call was given in even a single case. None of the consumer declarations describe such a verification call; the Welcome Call was not given to either of the FTC's investigators; and when one FTC investigator listened to two verification recordings submitted by the Better Business Bureau, in one the telemarketer said the Discount Card was not insurance, but spoke so quickly that the investigator had to listen three times to understand, and in the other call, the telemarketer does not make any clarification regarding whether the Discount Card is insurance. (*See, e.g.,* PX 30 at 4–5.) Moreover, a verification script must "dispel the confusion that the defendants' representations created among customers." *FTC v. USA Fin., LLC*, 415 Fed.Appx. 970, 973–74 (11th Cir.2011); *see also FTC v. IAB*, 746 F.3d 1228, 1233 (11th Cir.2014) ("IAB offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales."); *Vacation Prop. Servs.*, 2012 WL 1854251, at \*3 ("Notwithstanding the verification process, the calls by VPS continued to create the overall impression that the telemarketers' false and misleading representations were true."). There is no evidence before the Court on which it could conclude that the Welcome Call would have dispelled customer confusion even if the call were given in every case.

In essence, Kieper's first two arguments boil down to a blanket assertion that PIHC should not be held at fault because PIHC had no intent to deceive and had no knowledge of the misrepresentations. As previously discussed, however, intent to deceive is not necessary to establish liability. *Windward Mktg.*, 1997 WL 33642380, at \*9. The numerous customer complaints from 2010 until 2014, the many emails between Kieper, his marketers, and his employees, as well as the investigation by the Wisconsin Better Business Bureau show that, at the very least, PIHC acted with reckless disregard of the truth. That is sufficient to establish liability. *See In re Sears Roebuck & Co.*, 95 F.T.C. at 517 n. 9.

■ Kieper's final argument against PIHC's liability is equally without merit. To his opposition, Kieper attached copious exhibits which included Discount Card members' files showing the discounts that were actually received, as well as testimonials by allegedly satisfied PIHC customers. With the files showing discounts,

Kieper appears to be arguing that the Discount Card was not worthless. Worthlessness, however, is not an element of a claim for deceptive practices. Furthermore, Courts have also routinely rejected the argument that the existence of satisfied customers is a defense to liability. *See, e.g., Capital Choice Consumer Credit,* 2003 WL 25429612, at *7–8 ("[I]t is well settled that the existence of some satisfied customers ... is not a defense to liability."); *FTC v. Wilcox,* 926 F.Supp. 1091, 1098–99 (S.D.Fla.1995) ("[T]he FTC does not need to show that *every* reasonable consumer would be misled by the advertisements .... Indeed, advertisements are illegal if they have a 'tendency' or 'capacity' to deceive; actual deception of particular consumers need not be proven.")

In sum, the FTC has proffered sufficient uncontroverted evidence in support of its motion for summary judgment which shows that the Discount Card was marketed through misrepresentations that it was health insurance. This evidence is sufficient to shift the burden to Kieper to "demonstrate with evidence that is 'significantly probative' or more than 'merely colorable'" that the marketers representations were not misleading within the meaning of 15 U.S.C. § 45(a). *See Capital Choice Consumer Credit,* 2003 WL 25429612, at *8; *FTC. v. Cyberspace.com, LLC,* No.Coo–1806, 2002 WL 32060289, *1 (W.D.Wash. July 10, 2002); *FTC v. Gill,* 265 F.3d 944, 954 (9th Cir.2001). Kieper has not carried this burden. Accordingly, the Court finds that the FTC has established PIHC's violations of 15 U.S.C. § 45(a).

### ii. Kieper's Individual Liability

■ After establishing a corporate violation, the FTC can establish individual liability under Section 5 of the FTC Act by showing "that (1) an individual participated directly in the deceptive acts or practices *or* had authority to control them, and (2) that the individual had some knowledge of the corporation's improper practices." *FTC v. FTN Promotions, Inc.,* No. 07–cv–1279, 2008 WL 821937, at *2 (M.D.Fla. Mar. 26, 2008) (emphasis added). "[D]irect participation in the fraudulent practices is not a requirement for liability. Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." *FTC v. Atlantex Assocs.,* No. 87–45, 1987 WL 20384, at *9 (S.D.Fla. Nov. 25, 1987) (Nesbitt, J.), *aff'd,* 872 F.2d 966 (11th Cir. 1989). "An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *FTC v. Transnet Wireless Corp.,* 506 F.Supp.2d 1247, 1270 (S.D.Fla. 2007) (Marra, J.) (quotation omitted).

■ Moreover, as was the case with corporate liability, intent to deceive is not necessary. To satisfy the knowledge requirement, the FTC must show that the individual had "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *FTC v. 1st Guar. Mort. Corp.,* No. 09–cv–61840, 2011 WL 1233207, at *15 (S.D.Fla. Mar. 30, 2011) (O'Sullivan, Mag. J.) (quoting *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir.1989)). An individual's degree of participation in the business is probative of knowledge. *See id.*

■ Here, it is undisputed that Kieper was the president and sole officer of PIHC and TRD. He also controlled the day-to-day activities of both companies. These

facts alone are sufficient to establish the first element of individual liability. *See FTC v. Glob. Mktg. Grp., Inc.*, 594 F.Supp.2d 1281, 1289–90 (M.D.Fla.2008) (holding that a corporate officer who "actively participated in and exercised a great deal of control over the corporations' day-to-day activities" could be held individual liable); *Windward*, 1997 WL 33642380, at *13 ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.") (quoting *Standard Educs., Inc. v. FTC*, 475 F.2d 401, 403 (D.C.Cir.1973)). Moreover, Kieper, through the marketing agreements, had the authority to review and approve all marketing materials and received emails from marketers containing scripts for approval. *See FTN Promotions*, 2008 WL 821937, at *3 (considering an individual's involvement in the review of marketing scripts probative to knowledge).

The uncontroverted evidence also sufficiently establishes that Kieper had knowledge of the deceptive practices through numerous consumer complaints, the Better Business Bureau's investigation, emails from his employees and marketers, and the high cancellation rate made available to him through Enrollment123. *See, e.g., IAB*, 746 F.3d at 1233 (finding that a report to the head of a company from the company's chief compliance officer that sales representative had misrepresented the nature of the company's product established knowledge for individual liability); *Glob. Mktg. Grp., Inc.*, 594 F.Supp.2d at 1289–90 (finding that individual's receipt of "periodic reports detailing the telemarketers' high return rates" and handling "law enforcement inquiries" was sufficient to establish knowledge). Furthermore, Kieper's conclusory assertions that he took all remedial actions necessary to prevent mis-

representations is insufficient to create a material issue of fact as to personal liability. *See FTC v. World Media Brokers*, 415 F.3d 758, 765 (7th Cir.2005). At the very least, the evidence establishes that Kieper acted with reckless disregard of the truth. Therefore, the Court will enter summary judgment against Kieper on Count 1.

## B. Counts 2 and 3: Violations of the TSR

 In Count 2, the FTC asserts that Kieper violated the TSR by representing that the Discount Card was insurance. The TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, in the sale of goods or services ... any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(ii). The TSR also prohibits "making a false or misleading statement to induce any person to pay for goods or services ...." 16 C.F.R. § 310.3(a)(4). A violation of the TSR also constitutes an unfair or deceptive act or practice in violation of Section 5 of the FTC Act. 15 U.S.C. §§ 57a(d)(3), 6102(c). Therefore, for the same reasons that the Court found Kieper liable for Count 1, Kieper is also liable for Count 2. *See USA Fin.*, 415 Fed.Appx. at 974 (affirming summary judgment on a TSR violation for the same reasons summary judgement was granted under Section 5 of the FTC Act).

Finally, under Count 3, the FTC asserts that Kieper violated the TSR by assisting and facilitating the marketers' misrepresentations to consumers. "It is a deceptive telemarketing act or practice and a violation of [the TSR] for a person to provide substantial assistance or support to any seller or telemarketer when that person

knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of [the TSR]." 16 C.F.R. §.310.3(b). "Facilitating" includes

> providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel-related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered.

Telemarketing Sales Rule Statement of Basis and Purpose, 60 Fed. Reg. 43,842, 43,852 (August 23, 1995); *FTC v. Capital Choice Consumer Credit, Inc.* (*"Capital Choice II"*), No. 02–21050, 2004 WL 5149998, at *41 (S.D.Fla. Feb. 20, 2014) (Ungaro, J.). "The FTC must identify something more than 'casual or incidental' help to the telemarketer, but does not have to show a 'direct connection' between the assistance and the misrepresentation for an entity to be liable under § 310.3(b)." *FTC v. HES Merch. Servs. Co.*, No. 12–cv–1618, 2014 WL 6863506, at *7 (M.D.Fla. Nov. 18, 2014) (quotation omitted).

Here, multiple marketers testified that they could not have done business without the support of PIHC and Kieper. (*See* PX 27 at 4–5; PX 28 at 4–6.) PIHC handled the processing of all payments for the Discount Card, sent the handbook and materials to the customers, and opened merchant accounts for marketers which were essential to their operations. Kieper also reviewed marketers' materials and dealt with any complaints to the Better Business Bureau. PIHC and Kieper continued to provide this assistance even after receiving numerous customer complaints about the marketers' misrepresentations. These facts are sufficient to establish that PIHC, and Kieper individually, provided substantial assistance to the telemarketers in violation of the TSR. *See, e.g., Capital Choice II*, 2004 WL 5149998, at *7–8 (providing another company with two merchant accounts was sufficient to establish a TSR violation). Accordingly, the Court grants the FTC's motion for summary judgment on Count 3.

## C. Remedies

### i. Injunctive Relief

Under Section 13(b) of the FTC Act, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). A court can enter a permanent injunction "against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir.1996). "Permanent injunctive relief is appropriate when 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *FTC v. RCA Credit Serv., LLC*, 727 F.Supp.2d 1320, 1335 (M.D.Fla.2010) (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980)). Courts should consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's

recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982). Moreover, courts have discretion to include "fencing-in" provisions which "extend beyond the specific violations at issue in the case to prevent Defendants from engaging in similar deceptive practices in the future." *Id.* These provisions "must bear a reasonable relation to the unlawful practices found to exist." *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (quotation omitted).

 In this case, injunctive relief is necessary because the evidence shows a reasonable likelihood that Kieper will commit violations in the future. Of particular concern is Kieper's continued denial that he did anything wrong despite the fact that he received customer complaints about the violations as early as 2010 and that he did not take steps necessary to halt the misrepresentations in a four-year span. Rather than take responsibility for his actions, Kieper blames everyone from individual telemarketers, to the marketing companies, to the Better Business Bureau, to counsel for the FTC. Moreover, although the Court has frozen PIHC's assets and appointed a receiver, Kieper has operated multiple companies in the insurance industry, including three companies in addition to PIHC that were involved in this case. Kieper's occupation undoubtedly presents opportunities for future violations. Accordingly, the Court will order permanent injunctive relief after the FTC moves for and the Court enters judgment against PIHC.

### ii. Monetary Relief

In addition to injunctive relief, Section 13(b) provides for ancillary relief, including restitution and disgorgement of unlawfully obtained funds. *See Gem Merch. Corp.*, 87 F.3d at 469–70; *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir.1984) (holding that the equitable powers granted in Section 13(b) include the power to order restitution and rescission of consumer contracts). "To obtain restitution on behalf of consumers, the FTC must show consumer injury but it is not required to show reliance by each individual consumer." *RCA Credit Serv.*, 727 F.Supp.2d at 1335–36; *see also McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir.2000).

 As discussed previously, "[a] presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *McGregor*, 206 F.3d at 1388 (quotation omitted). "In a Section 13(b) action of this kind, the proper measure of restitution is the purchase price of Defendants' services less any refunds paid to consumers." *RCA Credit Serv.*, 727 F.Supp.2d at 1336.

 To determine the amount of restitution, the FTC bears the burden to "show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate." *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir.1997). The FTC may carry its burden based on estimations. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir.2006). "The absence of necessary information 'does not automatically mean that the Commission's calculations are not reliable. The risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.'" *RCA Credit Serv.*, 727

F.Supp.2d at 1337 (quoting *Febre,* 128 F.3d at 535).

Here, John Aiken, a FTC investigator who is also a Certified Fraud Examiner ("CFE"), went through PIHC's files to estimate the amount of loss. (PX 48 at 5.) Using the Enrollment123 software, Aiken executed a "Transactions by Enrollment Agent Report." (*Id.*) From this report, Aiken was able to conclude that the "corporate defendants and their affiliates made $9,738,588.86 in gross sales ... from consumers" over the relevant time period. (*Id.*) Over the same period, $992,494.68 in refunds was recorded. (*Id.*) Therefore, the total amount earned from consumers is $8,746,094.18. (*Id.*) In his opposition, Kieper failed to address Aiken's calculations or dispute the amount of restitution. Accordingly, the Court finds Kieper jointly and severally liable for $8,746,094.18 under Section 13(b) of the FTC Act. *See McGregor,* 206 F.3d at 1387 (affirming contempt sanction in the amount of gross sales and stating in dictum that, "[i]n the underlying action, the sanctions imposed by the district court would have been authorized by Section 13(b) ...."); *FTC v. Stefanchik,* 559 F.3d 924, 931 (9th Cir.2009) ("[B]ecause the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits.").

### 4. Conclusion

Because a reasonable jury could only conclude that PIHC's marketers made deceptive representations in order to sell the Discount Card and that Kieper had knowledge of these representations, the Court grants the FTC's motion for summary judgment against Kieper (ECF No. 163). The Court finds Kieper jointly and sever-ally liable for restitution in the amount of $8,746,094.18 and will order permanent injunctive relief after the Court enters judgment against PIHC. Furthermore, the Court construes Kieper's Motion for Denial of the Plaintiff's Reply (ECF No. 186) as a surreply.

**Done and ordered** in chambers, at Miami, Florida, on May 31, 2016.