[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-16265
_____

D.C. Docket No. 0:12-cv-61830-RNS

FEDERAL TRADE COMMISSION,

Plaintiff - Appellee,

versus

IAB MARKETING ASSOCIATES, LP, *et al.*,

Defendants - Appellants.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 27, 2014)

Before ANDERSON and GILMAN[*], Circuit Judges, and JOHNSON [*][*], District Judge.

GILMAN, Circuit Judge:

The sole question on appeal is whether the district court erred in entering a preliminary injunction, which includes an asset freeze, in a case where the defendants are accused of deceiving consumers in the sale of trade-association memberships. Because we conclude that the court did not err, the entry of the preliminary injunction is **AFFIRMED**.

## I.    BACKGROUND

In September 2012, the Federal Trade Commission (FTC) filed suit against IAB Marketing Associates, LP (IAB), James C. Wood, James J. (Joshua) Wood, Michael J. (Jacob) Wood, Gary D. Wood, and other related defendants. The FTC alleged in its complaint that the defendants had violated the Federal Trade Commission Act (the FTC Act), 15 U.S.C. § 45(a), and the Telemarketing and Consumer Fraud and Abuse Prevention Act (the Telemarketing Act), 15 U.S.C. § 6102, by deceiving consumers in the sale of trade-association

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[*][*] Honorable Inge Prytz Johnson, United States District Judge for the Northern District of Alabama, sitting by designation.

2

memberships.  According to the FTC, consumers were led to believe that they were purchasing major medical insurance, but what they actually received were memberships in a trade association that offered only limited discounts for certain medical care.

IAB purports to be a nonprofit organization dedicated to advancing the interests of small-business owners and self-employed persons across America.  The organization, which was founded by James Wood, has existed in some form since 1982.  Today, IAB is part of a constellation of organizations controlled by James Wood and his immediate family.  Revenue from the nonprofit organization flows to for-profit entities controlled by James and his sons, Jacob and Joshua.

Much of IAB's actual business involves the sale of trade-association memberships to consumers through telemarketing efforts by IAB and various independent contractors.  These memberships offer discounts in a hodgepodge of areas, including medical care, dental care, golf, hotels, legal services, prescription eyewear, rental cars, tax-preparation services, and travel.  But none of the medical-discount plans sold by IAB are the equivalent of major medical insurance.  Instead, consumers typically receive upfront discounts from participating providers or modest reimbursements after submitting claim forms.  Some of the plans mimic traditional insurance coverage, but even under those plans IAB rather than the

3

individual consumer is the policyholder of a group health-insurance policy. All of the plans are subject to numerous exclusions and limitations.

IAB relies on third parties for much of the telemarketing component of its business. Its most important telemarketer is Health Service Providers, Inc. (HSP), an entity controlled by Roy and Judy Hamilton. HSP and the Hamiltons are named as codefendants, but are not parties to this appeal.

State regulators took notice of IAB several years ago. In particular, the Attorneys General of Illinois and Texas sued IAB in 2005 for deceptive trade practices. Both cases resulted in the entry of consent decrees in the respective state courts.

Before filing suit in September 2012, the FTC conducted an undercover investigation of IAB and its practices. Pursuant to this investigation, which was undertaken in 2011 and 2012, FTC investigators made telephone contact with IAB representatives and expressed interest in obtaining health insurance. The representatives assured the investigators that IAB's medical-discount plans were functionally equivalent to major medical insurance. Numerous consumers were similarly misled by IAB and its third-party telemarketers. And IAB's customers were apparently an unhappy lot because the number of cancellations exceeded the number of new memberships between January 2009 and September 2012.

When the FTC filed its complaint against IAB and the other defendants, it simultaneously sought a temporary restraining order to freeze a portion of the defendants' assets and to appoint a receiver for the purpose of accounting for all the defendants' assets and preserving the status quo.  The district court granted the FTC's motion and entered a temporary restraining order in September 2012.  A preliminary injunction hearing was held the following month.  Before the hearing, many of the defendants, including HSP and the Hamiltons, stipulated to the entry of a preliminary injunction.  IAB and certain other defendants, however, chose not to enter the stipulation.

Following a one-day hearing, the district court entered a preliminary injunction against IAB, the individual Wood defendants, and IAB-affiliated entities.  In its findings of fact, the district court determined that the defendants had made material misrepresentations to consumers regarding the nature of the trade-association memberships.  The district court enjoined IAB from making any further sales, maintained the asset freeze, and appointed a receiver to take control of IAB's assets.  This timely appeal by IAB followed.

## II.    JURISDICTION

For the sake of completeness, we note that the district court transferred this case to the Northern District of Texas following the entry of the preliminary injunction and the filing of the notice of appeal by IAB.  The transfer order,

however, does not affect our jurisdiction over this appeal. *See Jones v. InfoCure Corp.*, 310 F.3d 529, 533 (7th Cir. 2002) (explaining that "[m]ost cases have implicitly held that appeals from orders granting or denying preliminary injunctions properly go to the court of appeals encompassing the transferor court's district"); *see also Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 986 (11th Cir. 1982) (explaining that circuit courts lack appellate jurisdiction to review the decisions of out-of-circuit district courts).

### III.   ANALYSIS

### A.   Standard of review

We review the grant of a preliminary injunction under the abuse-of-discretion standard. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343 (11th Cir. 2008). The same standard applies to our review of an asset freeze. *CFTC v. Levy*, 541 F.3d 1102, 1110 (11th Cir. 2008). A district court's findings of fact will not be disturbed unless those findings are clearly erroneous. *Wilshire Inv. Mgmt.*, 531 F.3d at 1343. Legal conclusions are reviewed de novo. *Id.*

For the FTC to obtain injunctive relief, it must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217–18 (11th Cir. 1991). Unlike private litigants, the FTC need not demonstrate irreparable injury in order to obtain injunctive relief. *Id.* at 1218.

6

**B.    Issues presented**

IAB first argues that the FTC failed to carry its burden of proving that injunctive relief was warranted.  IAB's second argument is that the district court erred in ordering the asset freeze.  Finally, IAB contends that the district court lacked jurisdiction to enter any injunctive relief at all.

**C.    The FTC met its burden of proof for injunctive relief**

IAB first argues that the FTC failed to satisfy its burden of proof for obtaining injunctive relief.  Much of IAB's argument on this point consists of unsupported and unhelpful rhetoric, with such statements as "[t]his case involves one of the most dramatic and complete deprivations of property rights ever occurring in any federal court."  IAB, however, does offer a few substantive arguments.  For example, IAB contends that rogue third-party telemarketers, and not IAB, are to blame for any misrepresentations.  IAB more broadly contends that it cannot be held liable for the misrepresentations, if any, made by the various independent contractors it engaged to sell its products.

We find no merit in IAB's argument.  Individuals may be liable for FTC Act violations committed by a corporate entity if the individual "participated directly in the [deceptive] practices or acts or had authority to control them."  *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 467–68 (11th Cir. 1996) (holding an individual liable

7

under the FTC Act where he "was aware that salespeople made material representations to consumers to induce sales, and he was in a position to control the salespeople's behavior"). Authority to control, in turn, may be established by "active involvement in business affairs and the making of corporate policy" and by evidence that "the individual had some knowledge of the practices." *Amy Travel Serv.*, 875 F.2d at 573. Finally, the FTC must establish that "the individual had some knowledge of the [deceptive] practices." *Id.*

In the present case, IAB and the Wood defendants attempt to absolve themselves by blaming HSP and other allegedly rogue telemarketers for any misrepresentations made to consumers. They argue that liability cannot attach for misrepresentations made by third-party telemarketers absent direct participation in, knowledge of, and the ability to control the telemarketers' behavior. Even assuming without deciding that the standard is as demanding as IAB and the Wood defendants suggest, we find that the FTC has met that standard here.

For one thing, the FTC offered evidence that IAB and the Woods (all of whom were active in IAB's affairs) knew that the telemarketers were making material misrepresentations. James Wood, for example, received a report from IAB's chief compliance officer that sales representatives had misrepresented the nature of IAB's products to consumers. The evidence also showed that Jacob,

8

Joshua, and Gary Wood possessed similar knowledge.  In short, IAB and the Wood defendants cannot plausibly claim ignorance regarding the misrepresentations.

IAB next attempts to shift the blame to its customers.  It argues that consumers incorrectly assumed that what they were purchasing would be the equivalent of major medical insurance.  According to IAB, if these consumers had read the disclosures sent to them following their purchases, they would have known that what they bought was not major medical insurance, but memberships in a trade association offering medical-discount plans.

This argument fails for two reasons.  First, IAB offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales.  The second reason is simpler:  *Caveat emptor* is not the law in this circuit.  *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (holding that *caveat emptor* is not a valid defense to liability arising from misrepresentations).

IAB argues, alternatively, that its products did offer significant value to consumers.  Perhaps this is so, but liability for deceptive sales practices does not require that the underlying product be worthless.  *See id.* ("[N]o one doubts the utility of phone cards or claims that the product is a scam; all that is at issue are the statements made by the defendants.").  In sum, the FTC offered substantial evidence of consumer harm, as well as knowledge and participation by IAB and

9

the Wood defendants.  And the FTC satisfied its burden of proof by demonstrating

that it is likely to succeed on the merits and that an injunction would serve the

public interest.  The district court therefore did not abuse its discretion by entering

the preliminary injunction.

**D.    The district court did not err in freezing the defendants' assets**

IAB next challenges the asset freeze.  Specifically, IAB contends that the

district court abused its discretion by freezing a portion of the defendants' assets

without first attempting to calculate the amount by which IAB and the Wood

defendants had unlawfully enriched themselves.

An asset freeze is within the district court's equitable powers.  *FTC v. Gem

Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ("[A] district court may order

preliminary relief, including an asset freeze, that may be needed to make

permanent relief possible.").  The FTC's burden of proof in the asset-freeze

context is relatively light.  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735

(11th Cir. 2005) (per curiam) (explaining that only a "reasonable approximation of

a defendant's ill-gotten gains" is required for an asset freeze and that "[e]xactitude

is not a requirement").

Here, the court-appointed receiver retained an accounting firm to untangle

the Wood defendants' many assets and to estimate IAB's revenues.  The report

from the receiver disclosed that IAB and its affiliates earned over $70 million

10

between 2009 and 2012, with virtually all of the income (95%) attributable to the sale of trade-association memberships. James Wood alone earned over $6 million during the same period. By contrast, the value of the assets frozen by the district court totaled only $2.3 million, or approximately 3% of IAB's gross income between 2009 and 2012.

IAB nevertheless argues that the district court should have calculated the amount of IAB's ill-gotten gains before freezing any assets. In support of this argument, IAB relies on two cases. The first case is an unpublished opinion from this court, *FTC v. Bishop*, 425 F. App'x 796 (11th Cir. 2011). According to IAB, *Bishop* held that it is an "abuse of discretion to freeze assets without making a reasonable approximation of restitution." *Bishop*, however, contains almost no analysis (in large part because it is a two-page, unpublished disposition), which makes IAB's reliance on it misplaced. *See* 11th Cir. R. 36-2 (explaining that unpublished opinions are "not considered binding precedent"); *see also Bravo v. United States*, 532 F.3d 1154, 1163 n.5 (11th Cir. 2008) (noting that unpublished opinions necessarily contain abbreviated discussion and analysis).

The second case relied on by IAB for its asset-freeze argument is the out-of-circuit decision in *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006). *Verity*, however, is distinguishable because the key issue in that case was the appropriate amount of restitution where multiple nonparty middlemen retained a

11

significant portion of the total revenues. *See id.* at 68 ("The defendants-appellants received consumers' money through eBillit, and they paid Sprint, AT&T U.K./Viatel, Telecom Malagasy, and GIB from those unjustly received consumer funds."). The Second Circuit remanded the case so that the district court could "consider how much of this sum was in fact received by the defendants-appellants and is therefore subject to an order of restitution." *Id.*

No equivalent facts exist in the case before us. First, the third-party middlemen here—namely, the independent contractors who did telemarketing work for IAB—were parties to the suit below, although they eventually stipulated to the entry of a preliminary injunction. Moreover, the Second Circuit's decision to remand in *Verity* did not turn on the alleged value of the goods or services provided by the defendants, contrary to IAB's argument in this appeal.

IAB nevertheless contends that the district court should have ascertained how much money consumers saved on golf, medical care, prescription eyewear, and travel, and deducted those savings from the total amount of assets frozen. In essence, IAB argues that the district court failed to allow for the possibility that the products it sold had some residual value despite the misrepresentations. But, as the FTC correctly notes, the salient issue in fraudulent-misrepresentation cases "is whether the seller's misrepresentations tainted the customer's purchasing decisions," not the value (if any) of the items sold. *McGregor v. Chierico*, 206

12

F.3d 1378, 1388 (11th Cir. 2000); *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them."). We therefore discern no abuse of discretion by the district court in ordering the asset freeze.

## E.    The McCarran-Ferguson Act does not preempt the FTC's claims

IAB's final contention is that the FTC's enforcement action is preempted by federal law. In particular, IAB argues that the reverse-preemption provision of the McCarran-Ferguson Act, 15 U.S.C. § 1012, operates to deprive the district court of jurisdiction. The McCarran-Ferguson Act provides that "no Act of Congress shall be construed to invalid, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." *Humana Inc. v. Forsyth*, 525 U.S. 299, 304 (1999) (citing 15 U.S.C. § 1012(b)). Moreover, the FTC Act applies to the business of insurance only to the extent that such business is not regulated by state law. *Id.* at 309.

IAB argues that because state insurance commissioners and state departments of insurance oversee portions of its business, the FTC cannot take enforcement action against IAB for violations of the FTC Act or the Telemarketing Act. But this argument ignores the three-part test for which activities constitute the

13

business of insurance, a test set forth by the Supreme Court in *Union Labor Life*

*Insurance Co. v. Pireno*, 458 U.S. 119 (1982).  Under the *Pireno* test, an activity

constitutes the business of insurance if:

> [T]he practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.

*Id.* at 129 (emphasis omitted).

IAB's activities meet none of the above prongs.  First, IAB sold

trade-association memberships offering limited medical discounts, not insurance.

For this reason, no transfer or spreading of risk occurred because IAB, unlike an

insurance company, incurred no risk when a new member decided to enroll.

*See Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1247 (11th Cir. 1999)

(explaining that an insurer "assumes [the] risk for the policyholder in return for the

fees it collects" and "uses standard actuarial tables in order to limit its exposure

to . . . risks").

IAB's preemption argument also fails under the second prong of the *Pireno*

test because no relationship of an insurer to an insured exists between IAB and its

customers.  And its argument fares no better under the third prong because the sale

of trade-association memberships, and more particularly medical-discount plans, is

14

not limited to entities within the insurance industry. Reverse preemption under the McCarran-Ferguson Act is therefore inapplicable.

Nor is our decision altered by the fact that IAB is the policyholder under a group health-insurance policy. Although some consumers might receive coverage resembling that offered by traditional insurance, IAB's activities in this regard still do not satisfy the *Pireno* test for the reasons just discussed. Chief among these reasons is the fact that the practice of a trade association in allowing its members to become insureds under a group health-insurance policy is not limited to entities within the insurance industry. Non-insurance company associations frequently provide their members with benefits that include access to group insurance.

## IV.   CONCLUSION

For all of the reasons set forth above, the entry of the preliminary injunction by the district court is **AFFIRMED**.

15