[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14248

Non-Argument Calendar

_____

FEDERAL TRADE COMMISSION,
OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

Plaintiffs-Appellees,

*versus*

LIFE MANAGEMENT SERVICES OF ORANGE COUNTY, LLC,
a Florida limited liability company, et al.,

Defendants,

KEVIN W. GUICE,

individually and as an officer of

Loyal Financial & Credit Services, LLC,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:16-cv-00982-CEM-GJK

————————————

Before LUCK, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Kevin Guice swindled thousands of people by falsely promising that he could reduce their interest rates on, and even eliminate, their credit card debt. What he didn't tell them was that accepting his offer would eviscerate their credit ratings and cost them thousands of dollars. The Federal Trade Commission, along with the Florida Attorney General, brought suit to put a stop to Guice's scheme and to recover what they could. The district court entered summary judgment for the Federal Trade Commission and the Attorney General, issued a permanent injunction, and ordered twenty-three million dollars of disgorgement. Guice now appeals. After careful review, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2011, Kevin Guice incorporated a debt services company called Loyal Financial & Credit Services. Loyal purported to offer two main services. First, it offered customers the opportunity to lower the interest rates on their existing credit card debt. To attract customers, Loyal cold-called people—including those on the Federal Trade Commission's "do not call" registry[1]—falsely claiming that it worked with credit card companies like Visa and MasterCard and that Loyal had "more power than the average consumer to reduce rates." Loyal boasted to customers that using its program would save them "thousands of dollars" and that they would pay off their debt "three to five times faster." And Loyal promised to get its customers zero percent interest rates permanently.

But what the customers didn't know was that Loyal's process required getting authorization to open a new credit card in the customer's name—a promotional card with a temporary zero percent interest rate—and then transferring the existing debt to the new card. When the new card's promotional rate expired, Loyal would just repeat the cycle. Loyal never mentioned, though, that transferring the debt typically triggered a "transfer fee" of some

---

[1] The registry is a national list of phone numbers whose owners have notified the Commission that they do not want to receive unsolicited telemarketing phone calls. *See* Federal Trade Commission, National Do Not Call Registry FAQs, https://www.consumer.ftc.gov/articles/national-do-not-call-registry-faqs (last accessed Jan. 28, 2022).

percentage of the balance transferred. And Loyal didn't tell customers that they would frequently have to open new cards and close old ones, or that doing so would damage their credit rating. For this "service," Loyal charged customers between five hundred and five thousand dollars.

In 2013, Loyal began offering the second service: debt elimination. For the debt elimination service, Loyal told customers to stop making payments to their credit cards and, once they had been in default for three months, Loyal would negotiate a settlement with their credit card companies. Loyal also told some customers that the debt would be paid off by a "government fund," and told others that there was a fund paid into by credit card companies as a lawsuit settlement. Either way, Loyal did not tell customers that stopping payment would hurt their credit and put them at risk for being sued by a debt collector. For this "service," Loyal charged between two thousand and twenty-six thousand dollars.

In February 2013, the Florida Department of Agriculture and Consumer Services began investigating Loyal and filed an administrative complaint alleging that it had employed unlicensed salespeople and was using unapproved telemarketing scripts. While the case ultimately settled, the Department refused to renew Loyal's telemarketing license. Later that same year, a former customer sued Loyal and Guice for promising to pay off her credit card balance and instead stealing her money while she was in a nursing home.

Facing this pressure, in February 2014, Guice directed an employee, Wayne Norris, to set up a new company called Life Management Services of Orange County, LLC. As Norris remembered it, Guice intended Life Management Services only to be a temporary measure until Guice's court case was "cleared up." Norris said that he registered the company in his wife's friend's name, but in reality, Guice owned Life Management Services. When asked at his deposition whether he set up Life Management Services, Guice invoked his Fifth Amendment privilege against self-incrimination.

Loyal and Life Management Services were essentially the same company. They offered identical services and used identical telemarketing scripts. They had the same employees—forty-two employees moved seamlessly from Loyal to Life Management Services. In fact, the employees testified that they didn't even know there had been a change until their new paychecks and renewed telemarketing licenses listed Life Management Services, not Loyal, as their employer.

Guice exercised substantial control over Life Management Services.[2] For instance, Guice directed its revenue flow and told others to withdraw money from its account for him. Guice also set hiring criteria and decided who should be interviewed. And Guice supervised Life Management Services's managers, meeting with them weekly. When asked at his deposition if he had the ability to

---

[2] Guice admits that he owned and controlled Loyal.

6                    Opinion of the Court                    19-14248

control Life Management Services, Guice again invoked his Fifth Amendment privilege.

Life Management Services (and Loyal) used "automatic dialers" to send prerecorded messages to customers nationwide, regardless of their status on the "do not call" registry. Ultimately, the Commission received over eight thousand consumer complaints about Loyal and Life Management Services. The Commission—along with the Florida Attorney General—sued Guice, Loyal, Life Management Services, a host of shell companies, and a few other officers associated with the scheme.

The complaint alleged that Guice and his companies had engaged in misleading and deceptive conduct, in violation of section 5 of the Federal Trade Commission Act and the Florida Deceptive and Unfair Trade Practices Act, and, in doing so, had also broken various Federal Trade Commission telemarketing regulations. Specifically, the Commission[3] complained that Guice and his companies made five specific misrepresentations.[4]

---

[3] For ease of reference, we refer to the Federal Trade Commission and the Florida Attorney General together as the Commission.

[4] In total, the complaint had eleven substantive counts. Counts one and two charged violations of the Federal Trade Commission Act and count eleven charged a violation of the Florida Deceptive and Unfair Trade Practices Act. Counts three through ten alleged violations of different Commission regulations. The complaint was organized so that the same conduct constituted multiple violations—for example, it charged that making misrepresentations about an affiliation with a financial institution violated the Federal Trade

19-14248                Opinion of the Court                        7

- First, that Guice and his companies were affiliated with a bank, credit card issuer, or credit card association.

- Second, that consumers who purchased the interest rate reduction program would have their credit card interest rates reduced substantially and permanently.

- Third, that consumers who purchased the interest rate reduction program would save "thousands of dollars in a short time."

- Fourth, that consumers who purchased the interest rate reduction program would be able to pay off their debts "much faster, typically three to five times faster."

---

Commission Act (count one(a)), Commission regulations (count four), and the Florida Deceptive and Unfair Trade Practices Act (count eleven(a)). Guice doesn't challenge on appeal whether the conduct alleged violated the law; he only argues that he was not liable for his employees' conduct. For this reason, we analyze whether Guice was liable for each misrepresentation and don't consider the district court's ruling that the misrepresentations constituted statutory and regulatory violations. Guice doesn't argue that they weren't. And they clearly were.

Additionally, Guice does not challenge his liability for count seven (receiving a fee before performing services), count nine (initiating an unlawful prerecorded message), or count ten (failing to pay "do not call" registry fees), so we omit any discussion of those counts.

- And fifth, that consumers who purchased the debt elimination services would receive a service "whereby [Guice] would use money obtained from a government fund, paid for by credit[]card companies, to pay off consumers' credit[]card debts within 18 months."

The complaint also alleged that Guice and his companies withheld material information to their potential customers, including that using their services could result "in a consumer having to pay a variety of fees to credit[]card issuers, including, among others, balance-transfer fees" and could negatively impact consumers' credit. Finally, the complaint alleged that Guice and his companies called people on the "do not call" registry.

All of the defendants except Guice settled and the Commission moved for summary judgment. In response, Guice argued that he did not control Life Management Services, so he could not be held responsible for its conduct. Guice also contended that his companies did what they said they could do: they had lowered customers' credit card interest rates; his debt elimination services were "legitimate and helpful"; and he did not participate in any misrepresentations, nor had he directed his employees to make any.

The district court concluded that there was no genuine dispute that Guice controlled Loyal and Life Management Services because he was their corporate officer and directed their activities, revenue, and hiring. The district court also concluded that the summary judgment evidence showed that Guice knew the

employees were making material misrepresentations and omissions and he failed to prevent them.  Ultimately, the district court entered summary judgment for the Commission on all counts, permanently enjoined Guice from operating a telemarketing company, and entered a judgment against Guice for twenty-three million dollars.  Guice now appeals the district court's summary judgment for the Commission.

## STANDARD OF REVIEW

"We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court." *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010) (emphasis omitted).  "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* at 1263–64.  "[T]he moving party has the burden of demonstrating that there are no genuine issues of material fact, but once that burden is met the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121–22 (11th Cir. 2014).  "Overcoming that burden requires more than speculation or a mere scintilla of evidence." *Id.* at 1122.

## DISCUSSION

Guice argues that there were four genuine issues of material fact that precluded summary judgment.  First, he says that there

was a genuine dispute about whether he controlled Life Management Services.  Second, he contends that there was a genuine issue about whether he knew misrepresentations were being made by Life Management Services's employees  Third, he argues that the affidavits he submitted from employees attesting that they had saved customers money created an issue of fact about whether his programs did what he said they would do.  And fourth, he maintains that rogue employees violated the "do not call" registry and he didn't know about the violations and was not responsible for them.

Before continuing, a few words about Guice's brief:  This was a complex case involving a web of shell companies, a large record, and convoluted financial terms.  The district court's order summarizing and analyzing the summary judgment record is fifty-one pages long.  On appeal, Guice's brief is sparse:  the argument section is two pages long, does not cite any case law, and cites to evidence submitted below just once.  We would be justified in deeming all of Guice's arguments abandoned.  *See Singh v. U.S. Att'y Gen.*, 561 F.3d 1278, 1279 (11th Cir. 2009) ("[A]n appellant's simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.").  Nevertheless, we try our best to address his arguments on the merits with help from the thorough and well-cited district court order.

### Control of Life Management Services

As a threshold matter, we first consider Guice's argument that there was a genuine dispute about whether he "controlled" Life Management Services. After all, if Guice did not control Life Management Services, then he cannot be liable for its employees' conduct.

It is black letter law that "[i]ndividuals may be liable for FTC Act violations committed by a corporate entity if the individual participated directly in the deceptive practices or acts or had authority to control them." *F.T.C. v. IAB Mktg. Assocs., L.P.*, 746 F.3d 1228, 1233 (11th Cir. 2014) (cleaned up). Authority to control can be established from "active involvement in business affairs and the making of corporate policy." *Id.* (cleaned up). And in order to impose individual liability, the Commission must establish that "the individual had some knowledge of the deceptive practices." *Id.* (alteration adopted).

The Commission met its burden to show that there was no genuine dispute of fact that Guice controlled Life Management Services and knew about its deceptive practices. Guice told his employee, Norris, to incorporate Life Management Services. Guice also directed Life Management Services's revenue into various shell companies and to be withdrawn from its accounts. Guice invoked his Fifth Amendment right not to self-incriminate when asked if he had the ability to control Life Management Services. While, like in a criminal case, a civil litigant may choose to invoke his right not to self-incriminate, unlike in a criminal case, in a civil

case, the court may impose an adverse inference against him. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).[5] The district court implicitly did so, and we will here as well. When asked if he was involved in writing Life Management Services's misleading call script—which was identical to Loyal's—Guice again took the Fifth. Lastly, Guice supervised and consulted with Life Management Services's managers weekly.

Guice's summary judgment evidence doesn't establish a genuine dispute as to his control of Life Management Services. Below, he relied on three facts: he "submitted" deposition testimony by two Loyal and Life Management Services employees—Lee Ann Brownell and Randi Stickles—who said that they "never saw" Guice at Life Management Services and one of whom, Stickles, said that she "did not consider Guice to be her boss"; Loyal and Life Management Services had different mailing addresses; and he was not named on any bank signature cards for any company except Loyal.

None of this supports a different result. First, the snippets of deposition testimony Guice cited don't create a disputed fact

---

[5] One exception to this rule is that a court cannot use an adverse inference "as a substitute for the need for evidence on an ultimate issue of fact." *Eagle Hosp. Physicians, LLC. v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009). But here, where Guice set up Loyal, directed the set-up of Life Management Services, and where both companies offered identical programs and used identical scripts, there is sufficient other evidence that summary judgment was not entered solely because of Guice's invocation of his Fifth Amendment privilege.

because they are not in the record.  Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support that assertion by . . . citing to particular parts of materials *in the record*." (emphasis added)).  Second, even if those portions were in the record, they wouldn't create a triable issue of fact because they don't bear on the issue at hand:  whether Guice had knowledge and control of what was happening at Life Management Services.

Guice says that neither Stickles nor Brownell ever saw him at Life Management Services and that Stickles didn't think that she worked for him.  But, Stickles admitted that she didn't pay attention to who she worked for as long as she was paid, and testified that she only remembered receiving checks from two people, one of whom was Guice.  Brownell, for her part, admitted that she didn't know who owned Life Management Services but identified Guice as her employer—one that she would text with weekly.

And, while it may be true that Loyal and Life Management Services had different mailing addresses and that Guice was not listed as an owner of the Life Management Services's bank account, the summary judgment evidence showed that Guice controlled the activities of Life Management Services's operations and activities and he was able to direct money out of Life Management Services's bank account and into his own.  Taken together, these facts don't create a genuine dispute—evidence such that "a reasonable jury could return a verdict for the nonmoving party"—about whether Guice controlled Life Management Services. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

*Misrepresentations and Omissions*

Second, Guice contends that there was a genuine dispute about whether he was individually liable for the misrepresentations and omissions made by Loyal and Life Management Services employees. Guice doesn't identify which statements he is talking about, but, because he cites to pages eighteen through twenty-one of the district court's summary judgment order, which discussed misrepresentations about affiliations with financial institutions, we assume he doesn't think he is liable for those misrepresentations.

As we've said, Guice is liable for Life Management Services's deceptive practices if he had the authority to control them, as long as he had knowledge. *See IAB Mtkg. Assocs., L.P.*, 746 F.3d at 1233 ("Individuals may be liable for FTC Act violations committed by a corporate entity if the individual . . . had authority to control [corporate entity] . . . as long as individual had some knowledge of the [deceptive] practice") (internal quotations omitted). Because we've already agreed that there is no genuine dispute that Guice controlled Life Management Services, all that's left to determine is whether the misrepresentations happened and whether Guice knew about them.

Below, the district court considered: (1) a number of affidavits from customers stating that salespeople for Loyal and Life Management Services told them that they were affiliated with financial institutions; (2) Loyal's and Life Management Services's telemarketing scripts which instructed employees to make those representations; and (3) employees' testimony that they did make

those representations.  The Commission also produced summary judgment evidence that the representations weren't true; in fact, Loyal, Life Management Services, and Guice had no connection to any bank or credit card company.  Finally, the Commission submitted evidence that Guice knew about these misrepresentations—including that Guice wrote the scripts which included them, and was forwarded emails from angry customers about the lies.

The district court concluded that these statements constituted violations of the Federal Trade Commission Act, the Florida Deceptive and Unfair Trade Practices Act, and the Commission regulation, and that Guice had knowledge of the violations.  Guice doesn't challenge this conclusion on appeal; he only argues that there is a genuine dispute as to whether he is liable.  This is because, he says, he didn't directly participate in any misrepresentations and, in fact, provided proof to the district court that it was a company practice to "inform employees 'not to mispresent facts to consumers' and 'that they were not to mislead the public.'"

There is no genuine dispute about Guice's liability.  Guice—both in the district court and on appeal—fails to cite any record evidence for the proposition that he did not participate in misrepresentations.  And the law is clear that "a sentence in an unsworn brief is not evidence." *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013).  Even if there was evidence, it wouldn't matter, because Guice's liability stems from his control of Loyal and Life Management Services, not from his individual conduct.  *See F.T.C. v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir.

1996) ("The fact that the actions for which [the individual defendant] was responsible were performed by Gem Merchandising does not lessen his individual liability."). Because Guice controlled Loyal and Life Management Services, and knew that both companies made the misrepresentations, he is liable.

Guice also relies on employee contracts and a snippet of a manager's testimony to argue that "efforts were made to ensure compliance[.]" But, again, the testimony Guice relies on isn't in the record. And as to the contracts, they required employees to "adhere[] [to the telemarketing script] verbatim" and provided that "[a]ny deviation from the script [would be] considered a serious violation." Those same scripts required employees to identify themselves as "work[ing] directly with the corporate office[s] of Visa, MasterCard, American Express and Discover[.]" So, in fact, the employee agreements *required* employees to make misrepresentations. And those agreements didn't, as Guice contends, prohibit making misrepresentations about affiliations with financial institutions. They only instructed employees not to misrepresent "[Life Management Services's] service or the price of any offered" and didn't say anything about whether Life Management Services "worked directly with the corporate office" of banks and credit card companies.

In short, the record makes clear there is no genuine issue of material fact that the misrepresentations happened and that Guice knew about them.

*Helpfulness to Consumers*

Third, Guice argues that there is a genuine dispute about whether his services were helpful to customers.

But, even if his services had some value to some customers, it wouldn't absolve him of liability. *See IAB Mktg. Assocs.*, 746 F.3d at 1233 ("[L]iability for deceptive sales practices does not require that the underlying product be worthless."). And, even if it could, the employee affidavits he relies on are not competent summary judgment evidence because they are unsworn. Affidavits that are not made under penalty of perjury do not constitute evidence under rule 56. *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements do not meet the requirements of Fed. R. Civ. P. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion." (internal quotation marks and alteration omitted)). Thus, Guice can't use them to create a genuine issue of material fact.

Below, Guice pointed to ten "consumers' files that were picked at random from huge boxes of files" that, he says, show that Loyal and Life Management Services customers benefitted from the credit services. But even assuming he is right, Loyal and Life Management Services still violated the law because they didn't disclose all the legally-required information to allow customers to make an informed decision. *See IAB Mktg. Assocs.*, 746 F.3d at 1233 (holding that merely making a material misrepresentation is sufficient to support liability). For example, Guice doesn't challenge the district court's conclusion that his telemarketers failed to

inform customers that stopping payment would hurt their credit and put them at risk for being sued by a debt collector.[6] And we've already agreed that the summary judgment evidence showed that Loyal and Life Management Services lied when they told customers that they were affiliated with major financial institutions and that there was a government fund that would pay off their credit card debts. Any "benefit" that Guice's customers may have received does not negate Guice's misrepresentations and omissions.

## Do Not Call Registry Violations

Finally, the complaint charged Guice with making—or "causing" a telemarketer to make—unsolicited calls to customers on the "do not call" registry. The Commission's rules prohibit "a telemarketer to engage in, *or for a seller to cause a telemarketer to engage in* . . . initiating any outbound telephone call" to a person on the "do not call" registry. 16 C.F.R. § 310.4(b)(1)(iii)(B) (emphasis added).

On appeal, Guice doesn't dispute that Loyal and Life Management Services contacted customers on the registry. Instead, he argues that because neither he "nor [his] employees ever initiated phone calls to consumers" and because "it is undisputed that an outside dialer or lead generator was used to make the outbound calls," he is not liable.

---

[6] As they were legally required to. *See* 16 C.F.R. § 310.3(a)(viii)(C).

This argument fails for at least two reasons.  First, he didn't make this claim to the district court, so we will not consider it for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1328 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered[.]").

Second, even if Guice was right that Loyal and Life Management Services used auto-dialers, it doesn't absolve him of legal liability.  The relevant regulation applies to anyone who makes, or who causes a third party to make, a call to a person on the registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).  The Commission submitted evidence—in the form of transcripts from salespeople and supervisors—that Guice's employees used automatic dialers to contact people on the "do not call" registry.  When asked about his involvement in using automatic dialers, Guice pleaded the Fifth.  As we've already explained, a defendant can be individually liable where he participated in the complained-of acts or had the authority to control them.  *See Gem Merchandising*, 87 F.3d at 470.  That Guice used a computer program to dial numbers instead of his fingers is immaterial to whether he caused the calls to be placed.  Nor does he cite any cases to the contrary—in fact the plain language of the regulation applies to people who "cause" calls to be made—which, in turn, means that the method (fingers or programs) is irrelevant. 16 C.F.R. § 310.4(b)(1)(iii)(B).  Guice cannot escape liability this way.

**AFFIRMED.**